# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ANNA BREEDING,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:07CV00066 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | Chief United States District Judge |
| **SOCIAL SECURITY**, | ) | |
| | ) | |
| Defendant. | ) | |

*David S. Bary, Wolfe, Williams, Rutherford & Reynolds, Norton, Virginia, for Plaintiff; Robert Kosman, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Anna Breeding filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C.A. §§ 401-433, 1381-1383 (West 2003 & Supp. 2008). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, the court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations omitted). It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The plaintiff protectively filed for DIB and SSI on October 5, 2005, alleging disability beginning April 14, 2002, due to shoulder and knee problems. (R. at 38.) This claim was denied initially on December 5, 2005 (R. at 267-71), and upon reconsideration on March 16, 2006. (R. at 261-63.) At her request, the plaintiff received a hearing before an administrative law judge ("ALJ") on June 4, 2007. (R. at 163-84.) At that time, a vocational expert and the plaintiff, who was represented by counsel, testified. (*Id.*) By decision dated June 19, 2007, the ALJ denied the plaintiff's claim for DIB and SSI. (R. at 15-29.)

The plaintiff filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council ("Appeals Council"), but was denied on October 25, 2007. (R. at 9.) Thus, the ALJ's opinion dated June 19, 2007, constituted the final decision of the Commissioner. The plaintiff then filed her Complaint with this court on November 26, 2007, objecting to the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues. The case is now ripe for decision.

II

The summary judgment record reveals the following facts.[1] The plaintiff was forty-eight years old when the ALJ made his decision, making her a younger individual under the Commissioner's Regulations. *See* 20 C.F.R. § 404.1563(c) (2008). She is a high school graduate and has a college degree in management. (R. at 43, 174.) She worked as a data clerk, department store clerk, and quality control

---

[1] In his decision, the ALJ applied res judicata to the plaintiff's claims that arose before July 21, 2005. (R. at 21-22.) As a result, he did not consider any evidence related to the period on or before that date. (R. at 22.) The plaintiff does not challenge the ALJ's decision in this regard. Thus, my review of the evidence is limited to those facts occurring after July 21, 2005. Earlier information is discussed only to provide context.

supervisor. (R. at 39.) She claims disability due to shoulder and knee problems. (R. at 38.)

On July 8, 2005, T. Lisle Whitman, M.D., operated on the plaintiff's lateral meniscus in her left knee. (R. at 87.) She experienced a slight tear in her meniscus after she fell in 2004. (R. at 92-96.) During a follow-up appointment with Dr. Whitman, the plaintiff stated that "[s]he is very pleased with her response" and that "[s]he has seen improvement in the strength and motion of her knee." (R. at 91.)

William Humphries, M.D., examined the plaintiff for the Virginia Department of Rehabilitative Services on November 15, 2005. (R. at 105-08.) He diagnosed the plaintiff with: (1) degenerative joint and disc disease of the cervical spine status post fusion, (2) injury to the rotator cuff of the right shoulder, (3) acute left knee injury, (4) mild degenerative joint disease in both hands and feet, and (5) degenerative joint disease in the left wrist. (R. at 108.)

Based on these diagnoses, Dr. Humphries opined that the plaintiff could sit for six hours out of an eight-hour workday, and could stand and walk for two hours out of an eight-hour workday. (*Id.*) In two to three months, the plaintiff would be able to stand and walk for six hours out of an eight-hour workday. (*Id.*) Her injuries would limit her to lifting twenty-five pounds occasionally and ten pounds frequently, and preclude overhead work. (*Id.*) She could occasionally climb, kneel, and crawl,

and without restriction stoop or crouch. (*Id.*) However, if imaging of her spine revealed degenerative joint or disc disease, she would be able to stoop and crouch only occasionally. (*Id.*) Dr. Humphries also recommended that she avoid heights and hazards. (*Id.*)

The plaintiff saw Teresa Roatsey, Family Nurse Practitioner, at Stone Mountain Health Services on January 9, 2006 for pain in her right pinky finger. (R. at 110.) X rays were negative, and Roatsey prescribed Naproxen and placed the right pinky finger in a splint. (*Id.*) The next day, Casey McReynolds, M.D., reviewed the X rays to confirm a "grossly normal right hand." (R. at 112.) FNP Roatsey saw the plaintiff again on August 21, 2007 for complaints of dizziness. (R. at 159.) The plaintiff refused a CT scan of her head or any referrals. (*Id.*) She was given sample prescription pills to counteract a "drying effect" and for dizziness, and was instructed to take Tylenol for pain or discomfort. (*Id.*)

Robert O. McGuffin, M.D., a state agency physician, conducted a physical Residual Functional Capacity ("RFC") assessment on November 30, 2005. (R. at 114-18.) He opined that the plaintiff could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and walk for two to four hours out of an eight-hour workday; sit for about six hours with normal breaks in an eight-hour workday; and occasionally push and pull. (R. at 115.) He concluded that the plaintiff

could occasionally climb ramps and stairs, but not ladders, ropes or scaffolds. (R. at 116.) Though the plaintiff could only occasionally stoop, kneel, crouch, and crawl, she could frequently balance. (*Id.*) She was limited in occasional overhead reaching, but unlimited in handling, fingering, and feeling. (*Id.*) Dr. McGuffin saw no visual limitations. (*Id.*) Frank M. Johnson, M.D., affirmed the opinions of Dr. McGuffin. (R. at 118.)

Eugenie Hamilton, Ph.D., performed a Psychiatric Review Technique and concluded that the plaintiff had "no mental diagnosis or treatment" and that her "allegations of complete inability to engage in all [substantial gainful activity were] not supported by the evidence . . . ." (R. at 134.)

On November 15, 2005, Richard Mullens, M.D., related a radiology report of the plaintiff's cervical spine from Johnston Memorial Hospital in Abingdon, Virginia. (R. at 135.) He reported a previous anterior cervical fusion from C5 through C7 and facet arthrosis, most pronounced at C3-C4 and C4-C5. (*Id.*) In March, 2007, Dr. Mullens examined radiology reports of the plaintiff's left knee and left ankle. (R. at 156-57.) Except for calcaneal traction spurs in the left ankle, he found no abnormalities. (*Id.*) In September, 2007, he reviewed a MRI of the plaintiff's cervical spine and opined that there was a previous anterior cervical fusion with instrumentation from C5 through C7, and that there was a minimal disc protrusion at

C4-C5, but no cervical cord compression. (R. at 154.) He also reported facet arthrosis bilaterally from C2-C3 through C4-C5. (*Id.*)

On March 21, 2007, the plaintiff met with William J. Hamil, M.Ed., a licensed psychological examiner. (R. at 136-45.) Though the plaintiff's attention was limited, her concentration was intact. (R. at 138.) He noted that the plaintiff "presented herself as overly virtuous" and that "her profile more accurately reflects symptom exaggeration." (R. at 140.) Hamil opined that "she should be able to comprehend and follow both simple and somewhat detailed job instructions and perform detailed and complex tasks." (R. at 142.)

Hamil diagnosed the plaintiff with "Depressive Disorder Not Otherwise Specified" and recommended mental health counseling. (*Id.*) He concluded that she would be able to "meet the demands of simple, detailed, and even complex-work related decisions." (*Id.*) She demonstrated a moderate ability to interact with others, a good ability to accept instructions, and an uninhibited ability to adapt to changes in the workplace, recognize hazards, and exercise caution. (*Id.*)

On November 11, 2007, the plaintiff visited the Emergency Department at Johnston Memorial Hospital because she thought she had digested "bad ice cream." (R. at 150.) She was discharged and told to follow-up with her primary care physician. (R. at 151.)

On March 3, 2007, Dr. Casey McReynolds reviewed an MRI of the plaintiff's lower extremities. (R. at 155.) She concluded that there was "[n]o evidence of internal derangement" and noticed only "[m]ild osteoarthritic changes." (*Id.*)

The evidence in this case also includes the plaintiff's testimony regarding her subjective claims and her activities of daily living. She related trouble using her right hand for normal activities, pain in her right arm and shoulder, and difficulty reaching overhead. (R. at 166-67.) She strained to turn her head from side to side and had frequent headaches. (R. at 168-69.) Her knee and leg problems affected her ability to stand and walk. (R. at 170.) She lies down at least two hours per day and avoids taking prescribed pain medication. (R. at 170-72.) Her emotional problems stem from the death of her mother. (R. at 174-75.) The plaintiff spends most of her day with her pets, though she finds it difficult to care for them. (R. at 175.) She cooks, does the laundry, and shops for groceries. (R. at 175-76.) Her injuries alter her mood which affects her appetite. (R. at 177.) She attends church often, but frequently experiences crying spells after interacting with her neighbors. (R. at 169, 177.)

Following the plaintiff's testimony, a vocational expert testified regarding the plaintiff's past work experience. He classified the plaintiff's past positions of office clerk, department store clerk, and quality control supervisor as semi-skilled to skilled,

- 8 -

Case 2:07-cv-00066-JPJ-PMS   Document 29   Filed 04/10/09   Page 8 of 16   Pageid#: 87

requiring light exertion. (R. at 180-81.) He stated that the plaintiff had transferable skills to a customer service representative or bookkeeper positions. (R. at 181.)

The ALJ asked the vocational expert about jobs for a hypothetical individual with the same age, educational level, and work experience as the plaintiff, and who had the same limitations that Dr. McGuffin included in his physical RFC. (*Id.*) The vocational expert testified that the individual would qualify for jobs as an office clerk, bookkeeper, telemarketer, or supervisor of telemarketers, positions similar to those she held in the past. (*Id.*) He stated that, in the national economy, there were 1,900,000 accounting jobs; 700,000 data entry jobs; 1,600,000 customer service representative jobs; 80,000 information clerk jobs; and 321,000 telemarketer jobs. (R. at 181-82.) He also testified that there were over 75,000 of these same jobs available in Virginia. (R. at 182.) The same number of jobs would be available if the hypothetical individual had the same limitations that Hamil noted in his psychological evaluation. (*Id.*) If that hypothetical individual had the same limitations that the plaintiff claimed she had experienced, no jobs would be available. (*Id.*)

In response to a question from the plaintiff's attorney, the vocational expert confirmed that the inability for an employee to make constant or frequent motions with his or her hands and arms would disqualify that employee from some of the jobs he classified as available. (R. at 184.)

- 9 -

III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

The Commissioner applies a five-step sequential evaluation process in assessing DIB and SSI claims. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2008) (2008). If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See id.*; *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987). The fourth and fifth steps in this inquiry require an assessment of the claimant's RFC, which is then compared with the

physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *See* 20 C.F.R. §§ 404.1560(b)-(c), 416.960(b)-(c).

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (internal quotations omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistences in the evidence. It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays*, 907 F.2d at 1456.

The plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence.[2]

---

[2] The ALJ found that the plaintiff's RFC allowed the following activities:

> [O]ccasionally lifting and carrying 20 pounds; frequently lifting and carrying 10 pounds; standing and/or walking at least two hours in an eight hour work day; sitting about six hours in an eight hour work day

- 11 -

In regard to her physical limitations, the plaintiff argues that the ALJ erred by failing to include the overhead restrictions noted by Morgan Lorio, M.D., Dr. Humphries, and Dr. McGuffin.

On two insurance carrier forms, Dr. Lorio stated that the plaintiff was permanently restricted from overhead activities. (R. at 100, 146.) The ALJ denied these statements great weight. (R. at 27.)

Even if Dr. Lorio qualified as a treating physician, his statements deserved neither controlling weight nor great weight. The opinion of a treating physician controls only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." 20 C.F.R. § 404.1527(d)(2) (2008). If not controlling, the weight afforded to a treating physician's opinion depends on the extent to which the opinion "presents relevant evidence to support an opinion, particularly medical signs and laboratory findings . . . ." 20 C.F.R. § 404.1527(d)(3) (2008).

---

        with normal breaks; occasional pushing and pulling; frequent balancing; occasional climbing, stooping, kneeling, crouching, and crawling; limited handling; avoidance of all exposure to hazards; and moderate limitation in the ability to interact appropriately with coworkers.

(R. at 23.)

- 12 -

Dr. Lorio completed these forms in September, 2005 and August, 2006, but had not treated the plaintiff since April, 2005. (R. at 27, 100, 146.) Dr. Lorio presented no evidence on these forms to support his statements. Accordingly, I find that the ALJ properly denied these statements great weight.

Dr. Humphries believed that the plaintiff's injuries would preclude overhead work. (R. at 108.) Dr. McGuffin, the state agency physician, opined that the plaintiff was restricted to occasional overhead reaching. (R. at 116.) While the ALJ found Dr. Humphries' opinion "consistent with a finding that the claimant is not disabled," he attributed greater weight to the opinion of Dr. McGuffin, "since it is consistent with the totality of the evidence of record." (R. at 27.)

Though the ALJ did not explicitly incorporate any overhead restrictions in his RFC determination, he included Dr. McGuffin's restrictions in his hypothetical to the vocational expert during the hearing, and then relied on the vocational expert's opinion to find that the plaintiff's RFC did not prohibit her from obtaining jobs similar to those she had in the past. (*Id.*) Thus, I find that even if the ALJ did err in failing to include overhead restrictions in his RFC determination, that error was harmless. *See Austin v. Astrue*, No. 7:06CV00622, 2007 WL 3070601, at *6 (W.D. Va. Oct. 18, 2007) (unpublished) (stating that "[e]rrors are harmless in Social Security cases when it is inconceivable that a different administrative conclusion

would have been reached absent the error.") (citing *Camp v. Massanari*, 22 F. App'x 311 (4th Cir. 2001) (unpublished)).

In regard to her mental limitations, the plaintiff seeks to attribute greater weight to certain aspects of Hamil's opinion while simultaneously criticizing other portions.

Specifically, the plaintiff argues that the ALJ erred by ignoring Hamil's statement that the plaintiff's "physical problems may detract from her ability to: maintain regular attendance, perform work activities on a consistent basis, and meet an employment schedule . . . ." (R. at 142.) This argument is without merit. Though Hamil reviewed the plaintiff's medical records, he did so only for the benefit of a psychological evaluation. Hamil is a psychological examiner, not a physician. None of the plaintiff's treating physicians make statements or predictions similar to his. Thus, the ALJ did not err by disregarding this statement.

The plaintiff also contends that Hamil failed to consider relevant evidence in his psychological evaluation of the plaintiff. In his report, Hamil explained that the plaintiff had a profile that would typically result in a schizophrenia diagnosis, but because her "history, presentation, and . . . records" had not included evidence of any past psychosis, he concluded that "her profile more accurately reflects symptom exaggeration." (R. at 140.)

In an earlier ruling on a separate disability application, the ALJ concluded that the plaintiff suffered from a severe schizotypal personality disorder. (R. at 216.) The ALJ based this determination on a report by Kathy Miller and Robert Spangler, both licensed psychologists.[3] (R. at 214, 696-700.) The plaintiff maintains that if Hamil had considered this past diagnosis, his evaluation of the plaintiff would have changed. I disagree.

It is unclear from the record whether Hamil considered the report by Miller and Spangler. But even if he failed to do so, the outcome of this case would remain the same. The previous ALJ determined that the plaintiff not only could return to past relevant work, but could also find work as a sales clerk, cashier, information clerk, order clerk, inventory clerk, food service worker, cleaner, hand packer, sorter, and assembler. (R. at 216.)

Indeed, Miller and Spangler acknowledged that the plaintiff's concentration and memory were good and had never received any sort of mental health treatment. (R. at 700.) Her schizotypal personality disorder limited her interpersonal functioning, but they found that the plaintiff had a fair ability to relate to co-workers,

---

[3] The plaintiff also asserts that she was diagnosed with schizophrenia. However, the previous ALJ did not consider that diagnosis, and in fact explicitly rejected it, since the source of that opinion did not qualify as an acceptable medical source. (R. at 214 (rejecting the statement by Bonnie Jessee, Master of Social Work intern).)

- 15 -

deal with the public, use judgment, and deal with work stresses. (R. at 701-02.) She had a good ability to follow work rules; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember, and carry out complex, detailed, and simple job instructions; to maintain personal appearance; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (*Id.*)

Accordingly, I find that there is substantial evidence to support the ALJ's determination that the plaintiff's RFC would not preclude her from finding past relevant work.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: April 10, 2009

/s/ JAMES P. JONES
Chief United States District Judge